## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ERIC M. MCROY,<br><br>        *Plaintiff*,<br><br>v.<br><br>MERCER COUNTY BOARD OF SOCIAL SERVICES, FRANK CIRILLO, DELORES SMITH, SUSAN RUCKMAN, ROBERT FORRESTER, CHRISTINA HARCAR, AMINI SABABU, JAMES CACACE, and JOHN WOOD,<br><br>        *Defendants*. | Civil Action No. 11-0202 (PGS) (TJB)<br><br><br><br>**MEMORANDUM** |

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on Defendants Mercer County Board of Social Services ("MCBSS"), Frank Cirillo, Delores Smith, Susan Ruckman, Robert Forrester, Christina Harcar, Amini Sababu, James Cacace, and John Wood's (collectively, "Defendants") Motion for Summary Judgment pursuant to FED. R. CIV. P. 56 (ECF Nos. 40 and 41). *Pro se* Plaintiff Eric McRoy ("McRoy" or "Plaintiff"), a social worker employed by the MCBSS, alleges that Defendants subjected him to discrimination and a hostile work environment and retaliated against him in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). The Court held oral argument in this matter on November 20, 2013. For the reasons set forth herein, Defendants' Motion for Summary Judgment is granted.

## I.     BACKGROUND

### A.  Parties

Plaintiff Eric McRoy is a resident of Trenton, New Jersey. (Compl. at 1). He has been

employed as a social worker by the Mercer County Board of Social Services since December 26,

1989. (*Id.*, Ex. A at 1). Defendant Mercer County Board of Social Services ("MCBSS"), established

pursuant to N.J.S.A § 44:1-1 *et seq.*, provides economic and social services to individuals and

families residing in Mercer County, New Jersey. Defendant Frank A. Cirillo serves as Director of the

MCBSS. (Defs.' Br. in Supp. of Summ. J. ("Defs.' Br.") at 2). Defendant Delores G. Smith is

employed by the MCBSS as an Assistant Personnel Officer. (Aff. of Delores G. Smith ("Smith

Aff.") at ¶ 1). Defendant Susan Ruckman is the former Administrative Supervisor of Social Work at

the MCBSS. Defendant Robert Forrester currently serves as Assistant Administrator of Social Work

at the MCBSS. (Aff. of Robert Forrester ("Forrester Aff.") at ¶ 1). Defendant Christina Harcar

serves as Assistant Administrative Supervisor of Social Work at the MCBSS. (Aff. of Christina

Harcar ("Harcar Aff.") at ¶¶ 1,13). Defendant Amini Sababu is a social worker at the MCBSS who

previously served as Supervisor of Social Work. (Defs.' Br. at 4). Defendant James Cacace currently

serves as Supervisor of Social Work at the MCBSS. (Aff. of James Cacace ("Cacace Aff.") at ¶ 12).

Defendant John Wood is a Senior Training Representative at the MCBSS.

### B.  Factual Background

Plaintiff Eric McRoy, an African American male, has been employed as a social worker by

the MCBSS since December 26, 1989. (Compl. at 1). The record indicates that he has lodged

numerous formal and informal charges of discrimination and harassment against his supervisors and

fellow employees at the MCBSS dating back to 2002. The instant dispute arises out of alleged

instances of discriminatory, harassing and retaliatory conduct that occurred primarily in 2006, 2007

and, most recently, in November 2010. The relevant facts for purposes of deciding Defendants'

instant Motion for Summary Judgment are as follows.

On January 31, 2006, Plaintiff attended an "open house tour" of the Family Preservation

Center ("FPC") and Marie Katzenbach School in West Trenton, New Jersey. (*Id*., Ex A. at 41).

While participating in an art class presented by the FPC, an employee of the non-profit corporation

Home Front, Inc.[1] named Lynne Wise, "came into the class and asked [Plaintiff] what [he] was

doing." (*Id*.). After describing that he was painting a sculpture that was to be hung on a wall with

those being created by other class participants, Ms. Wise allegedly responded by stating "Look at

Eric, we need to straighten him up, maybe we should hang him up by a chain." (*Id*.). Plaintiff,

having viewed the statement as racially insensitive, responded by informing Ms. Wise that "you

should never tell a black person that you are interested in hanging them, especially by a chain." (*Id*.).

One day later, on February 1, 2006, Plaintiff sent a memorandum to FPC Director Thora Faigle

reporting the incident. According to the memorandum, the "comments were made in front of several

program participants, the art instructor, and . . . Administrator Susan Ruckman." (*Id*. at 42).

On February 8, 2006, Plaintiff filed a complaint with the Director of the Family Development

Division of the New Jersey Department of Human Services alleging that he had been discriminated

against based on "color", "marital status", "race", and "sex" due to the prior week's incident. (*See id*.

at 48). In that complaint, Plaintiff alleged that "[his] Administrator Susan Ruckman participated in

[the allegedly discriminatory] actions by laughing at the comments made." (*Id*. at 44). One week

later, on February 14, 2006, Plaintiff received a handwritten note of apology from Ms. Wise stating:

"I'm very sorry for having caused you any pain. I feel terrible that a careless turn of phrase caused

you grief. That was certainly not my intention. I value our working relationship and I look forward

---

[1] Home Front, Inc., based in Lawrenceville, New Jersey, is a separate entity from the MCBSS which provides
services to the homeless of Central New Jersey.

to working with you in the future. Please accept my sincere apology." (Pl.'s Br. in Opp'n to Defs.'

Mot. for Summ. J. ("Pl.'s Opp'n Br."), Ex. 12). The record does not indicate whether the Family

Development Division investigated Plaintiff's February 8, 2006 complaint or whether a final

disposition regarding the complaint was ever made. The MCBSS itself apparently "investigated the

matter and had Ms. Ruckman go to sensitivity training in an attempt to satisfy [Plaintiff]." (Defs.'

Br. at 1).

     In September 2006, Plaintiff requested vacation time to take his wife to Ethiopia. According

to Plaintiff, at that time, his wife was continuing to experience negative side effects from two car

accidents that had occurred on March 24 and July 31, 2004, and he wanted to bring her to see her

mother before her "medical condition deteriorated even further." (Pl.'s Opp'n Br., Ex 12). Plaintiff's

supervisor allegedly denied Plaintiff's request on the advice of Ms. Ruckman. As a result of this

denial, Plaintiff "put in for personal Family Leave due to stress[]" after his "primary care physician

signed off on t[he] paperwork." (*Id.*). In explaining his decision, Plaintiff stated that he "had already

reserved difficult to obtain plane tickets, so it was imperative that [he] kept [his] schedule." (*Id.*). On

October 2, 2006, Assistant Personnel Officer Delores Smith sent a memorandum to Plaintiff

acknowledging his "request for a leave of absence for the period November 2, 2006 to December 12,

2006." (Compl., Ex. A at 35). In the memorandum, Ms. Smith wrote: "As your leave request is dated

September 19, 2006, and the actual leave begins over a month later, a physical has been scheduled

for you on Thursday, October 5, 2006 at 9:00 AM[.]" (*Id.*). On October 4, 2006, one day prior to his

scheduled physical, Plaintiff resubmitted his request for Family Leave only this time his request was

based on his wife's apparent medical condition and not his own stress. (Pl.'s Opp'n Br., Ex. 12).

Plaintiff was subsequently granted leave, took his scheduled trip to Ethiopia, and returned to New

Jersey on December 18, 2006. (*Id.*).

On January 25, 2007, Diana Hemphill, Operations Manager for Catholic Charities of the Diocese of Trenton, held a meeting with representatives of the MCBSS, including Plaintiff, to discuss issues involving transitional housing. During that meeting, which took place at the MCBSS, Plaintiff allegedly exhibited a confrontational demeanor towards Ms. Hemphill that brought her to tears. After receiving a letter from Ms. Hemphill complaining that Plaintiff had threatened her and other employees during the January 25, 2007 meeting, Director Frank Cirillo and Administrator Susan Ruckman conducted an investigation to ascertain whether disciplinary action was warranted. On February 6, 2007, following the conclusion of the investigation, Delores Smith issued Plaintiff a Preliminary Notice of Minor Disciplinary Action charging him with (1) conduct unbecoming a public employee in violation of N.J.A.C. § 4A:2-2.3(a)(6) and (2) violation of the MCBSS's Professional Conduct Policy in contradiction of N.J.A.C. § 4A:2-.23(a)(11). (*See* Dep. of Amini Sababu ("Sababu Dep."), Ex. 3 at 1). On February 16, 2007, a disciplinary hearing was held before Director Cirillo during which witness testimony was received.

On February 22, 2007, Director Cirillo issued a memorandum sustaining the charges against Plaintiff. In making his determination, Director Cirillo found that "[t]he testimony of the three witnesses testifying for [the] administration with regard to Mr. McRoy's demeanor and behavior at the meeting on January 25, 2007, was consistent in its details and found to be credible. This was in direct contrast to Mr. McRoy's contradictory and somewhat theatrical portrayal of events." (Sababu Dep., Ex. 3 at 2). The Director further found that "Mr. McRoy's actions were in direct contrast to the Board's policy regarding professional conduct and constituted behavior unbecoming a public employee." (*Id*.). Accordingly, Director Cirillo ordered that Plaintiff be "suspended for three days on February 28, 2007, March 7, 2007 and March 14, 2007[]" and recommended that Plaintiff receive

"mandatory training on professionalism in the workplace." (*Id*.). A Notice of Minor Disciplinary Action was served on Plaintiff the same day.

On March 8, 2007, Plaintiff filed a verified complaint with the New Jersey Division of Civil Rights ("DCR") alleging that the MCBSS discriminated against him based on race and sex in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 *et seq.*, and subjected him to reprisal for asserting his rights under the New Jersey Family Leave Act, N.J.S.A. 34:11B-1 *et seq*. Plaintiff asserted in his complaint that his allegations were based on: (1) the MCBSS having "reluctantly g[iven] him time off pursuant to the New Jersey Family Leave Act in order to take care of his wife who was ill as a result of being pregnant" and (2) having suspended him for three days "for being rude to a vendor." (Compl., Ex. A at 54). More specifically, Plaintiff alleged that he "was discriminated against because of his race and sex . . . [because] a similarly situated, non Black female . . . who was found to have been rude to a vendor was not suspended." (*Id*.). On April 24, 2007, the DCR sent a letter to Plaintiff acknowledging receipt of his complaint. (*Id*. at 51).[2]

On May 9, 2007, two months after filing his complaint with the DCR, Plaintiff received another Preliminary Notice of Disciplinary Action from Delores Smith charging him with (1) conduct unbecoming a public employee in violation of N.J.A.C. § 4A:2-2.3(a)(6) and (2) violation of the Mercer County Employee Integrity Policy and Professional Conduct Policy in contradiction of N.J.A.C. § 4A:2-.23(a)(11). The Notice described the allegations against Plaintiff as follows:

> On March 2, 2006, you were assigned to an emergency assistance case in which the client was in mortgage arrears on her home. On March 20, 2006, you paid 3 months arrears and later money owed for utilities. On June 4, 2006, your client indicated that she was thinking of moving and you told her that you were a real estate agent and would list her house for sale. On June 7, 2006, you became the

---

[2] Based on the record before the Court, there is no evidence that Plaintiff also filed a charge of discrimination with the EEOC based on these same allegations.

listing agent for the client's home. This is a direct violation of the Board's Integrity Policy. (Pl.'s Opp'n Br., Ex. 14).

On May 17, 2007, a disciplinary hearing was held before Director Cirillo during which witness testimony was received. On May 22, 2007, Director Cirillo issued a memorandum sustaining the charges against Plaintiff. In that memorandum, the Director noted that "[i]t has clearly been the established policy and practice of the [MCBSS] to protect the people it serves from any actual or perceived conflict of interest on the part of its employees. By his actions, Mr. McRoy violated the Integrity Policy and the Professional Conduct Policy that are designed to [e]nsure this public protection." (*Id.*). Accordingly, Director Cirillo ordered that Plaintiff be suspended without pay for five days – May 30, 2007, June 6, 2007, June 13, 2007, June 20, 2007, and June 27, 2007. (*Id.*). Two days later, on May 24, 2007, Plaintiff submitted a request for vacation days, two of which coincided with days on which he was to serve his suspension. (Sababu Dep., Ex. 10). The request was granted by Amini Sababu the same day without her having knowledge of the days on which Plaintiff's suspension was to occur. On May 25, 2007, Plaintiff sent an e-mail to Director Cirillo requesting information as to how he could appeal his May 22, 2007 suspension. (Pl.'s Opp'n Br., Ex. 15B). On June 8, 2007, Plaintiff submitted another request for leave of absence pursuant to the New Jersey Family Leave Act. By letter dated June 19, 2007, Director Cirillo granted Plaintiff's request for unpaid family leave for the period of June 18, 2007 to July 2, 2007.

On July 2, 2007, Assistant Administrator of Social Work Robert Forrester sent a memorandum to Director Cirillo expressing his concerns regarding Plaintiff's five-day suspension. He wrote:

> Eric McRoy has served 3 days of his suspension; two were served while on vacation for the period 6/4/07 thru 6/15/07. The vacation had been approved by his supervisor[] Amini Sababu prior to her knowing Eric had been suspended. Susan Ruckman and I talked about this issue and we both felt that the suspended days during the vacation period should not have been approved by the supervisor.

7

Since we found out about it after the fact, we could not deny the two days. Eric has been approved for unpaid Family Leave for the period 6/18/07 thru 7/2/07. The suspension days that were to be served 6/20/07 and 6/27/07 were not served because Eric had decided to take an unpaid Family Leave. Eric is now on vacation 7/2/07 thru 7/6/07, we are denying the use of a suspended day during this period. This vacation was also requested prior to the suspension. . . .I am requesting that Eric use his remaining two suspension days when he returns to work next week, 7/9/07 thru 7/13/07, so the suspension is more punitive. (Compl., Ex. A at 9).

In response to Mr. Forrester's letter, Director Cirillo subsequently changed Plaintiff's June 13, 2007 vacation day to a suspension day. On August 8, 2007, Plaintiff filed an official grievance against the MCBSS with AFSCME Local 2285 in which he alleged that his vacation days had been rescinded and his pay had been wrongfully docked. (*See* Sabubu Dep., Ex. 8).[3] Ms. Sababu received the grievance on August 13, 2007. On August 14, 2007, she issued a responsive memorandum to Plaintiff indicating that the June 13, 2007 vacation day was changed to a suspension day at the discretion of Director Cirillo. (Compl., Ex. A at 8). She also informed Plaintiff that "the 2.35 dockage" resulted from Plaintiff having failed to work the minimum eleven days per month required to earn vacation time under agency policy. (*Id*.). Ms. Sababu's memorandum further indicated that Plaintiff had in fact been paid for the May 31, 2007 date in question.

On August 16, 2007, the New Jersey Division of Civil Rights conducted an initial fact finding conference as part of its investigation into the discrimination allegations lodged in Plaintiff's March 8, 2007 complaint. Prior to the investigation being completed, Plaintiff requested that DCR transmit his complaint to the Office of Administrative Law ("OAL") for a hearing pursuant to N.J.S.A. 10:5-13 and N.J.A.C. 13:4-11.1. The matter was subsequently transferred to OAL on March 5, 2009.

On or about August 11, 2010, James Cacace, Supervisor of the MCBSS Intake Unit, accused Plaintiff of wrongfully accessing information from a database on the MCBSS's computer system.

---

[3] In his Response to Defendants' Interrogatories, Plaintiff alleged that he was "docked for an entire day on May 31, 2007 after reporting to work and working the entire day." (Pl.'s Resp. to Defs.' Interrogs. at ¶ 2).

After confronting Plaintiff with this accusation and explaining that Plaintiff "had no right accessing and printing . . . th[e] information [because] he was not a supervisor[,]" Mr. Cacace requested that Plaintiff report to Administrative Supervisor Christina Harcar. (Aff. of James Cacace ("Cacace Aff.") at ¶ 6). During this meeting, Plaintiff explained that he did in fact have access to the database and that his printing of information was, therefore, proper. Ms. Harcar subsequently investigated Mr. Cacace's accusations and found that "[Plaintiff] did have access to the system and Mr. Cacase was simply not aware that this system was accessible by [Plaintiff]." (Harcar Aff. at ¶ 6). According to Ms. Harcar, "Mr. Cacase's understanding that [Plaintiff] did not have access to the system was nothing more than a misunderstanding[.]"[4] (*Id*. at ¶ 7).

On November 10, 2010, Plaintiff attended a mandatory viewing of a documentary film produced by the Rescue Mission of Trenton, a "community partner" of the MCBSS. (Pl.'s Opp'n Br., Ex. 1). According to the Plaintiff, following the presentation of the film, MCBSS Senior Training Representative John Wood asked the audience for questions. In response, Plaintiff raised his hand and asked how long it took and how much it cost to produce the film. Mr. Wood allegedly responded "Does it really matter, Eric?" Plaintiff allegedly "found Mr. Woods['] remarks to be rude and a hostile display of publically [*sic*] belittling [him]." (Pl.'s Opp'n Br. at 3). According to Plaintiff, Mr. Woods apologized for his response the following day. (*Id*.).

After several adjournments at the request of the parties, Plaintiff's OAL hearing regarding his March 8, 2007 complaint eventually took place on September 19, 2011.[5] On November 15, 2011, the Honorable Dennis P. Blake, Administrative Law Judge ("ALJ"), issued an initial decision dismissing

---

[4] In his Opposition to Defendants' Motion for Summary Judgment, Plaintiff asserts that Defendant Cacace also discriminated against him by "approach[ing] [him] on a day that there was a severe snow emergency and demand[ing] exclusively from [him] that he indicate on his time sheet the exact time that [he] [had] arrived at the agency[.]" (Pl.'s Opp'n Br. at 6). Plaintiff does not specify the date on which this action allegedly occurred nor does he include this incident in his Complaint as a basis for his Title VII claims.
[5] According to Plaintiff, his "appeal at the OAL hearing was specifically limited to the three day suspension imposed by Director Cirillo" on February 22, 2007. (Pl.'s Statement of Facts at ¶ 8).

the complaint. *See McRoy v. Mercer Cnty. Bd. of Soc. Servs.*, 2011 N.J. AGEN. LEXIS 595 (N.J. Agen. 2011). After independently evaluating the evidence, the parties' submissions and the ALJ's decision, the Director of the DCJ adopted the ALJ's dismissal of the complaint in December 2011.

On January 13, 2011, eleven months prior to Judge Blake's decision being issued, Plaintiff filed the instant Complaint in the United States District Court for the District of New Jersey alleging that Defendants subjected him to numerous incidents of discriminatory, harassing and retaliatory conduct in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Specifically, Plaintiff contends that Defendants "created a [h]ostile [w]ork [e]nvironment for [him] through discriminatory practices . . .[and] violated [his] civil rights by not affording him the same treatment and rights as Caucasian employees." (Compl. at 2). Based on these allegations, Plaintiff demands "$15,000,000.00 for violation of [his] civil rights." (*Id*. at 4). On September 28, 2013, Defendants filed the instant Motion for Summary Judgment.

## II.   DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving

party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"

*Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). To do so, the non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. In other words, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* FED. R. CIV. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."). Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48. If a court determines, "after drawing all inferences in favor of [the non-moving party], and making all credibility determinations in his favor – that no reasonable jury could find for him, summary judgment is appropriate." *Alveras v. Tacopina*, 226 Fed. Appx. 222, 227 (3d Cir. 2007). "[P]ro se plaintiffs are not relieved of the obligation to set forth facts sufficient to survive summary judgment." *Jacobs v. Cumberland County Dept. of Corrections*, No. 09-0133, 2010 U.S. Dist. LEXIS 130007, 2010 WL 5141717, at *3 (D.N.J. Dec. 8, 2010).

**B.  Plaintiff's Title VII Claims**

**1.  Timeliness**

It is well-settled that before a plaintiff may bring an action in federal court under Title VII, he must exhaust his administrative remedies by complying with the procedural requirements set forth in 42 U.S.C. § 2000e-5. *See Weston v. Eastman Kodak Co.*, 235 F.3d 851, 854 (3d Cir. 2000); *see also Vanessa-Barnes: Bey v. State of N.J.*, 2012 U.S. Dist. LEXIS 119508, at *6-8 (D.N.J. Aug. 23, 2012). "The purpose of requiring exhaustion is to afford the EEOC the opportunity to settle disputes through conference, conciliation, and persuasion, avoiding unnecessary action in court." *Antol v. Perry*, 82 F.3d 1291, 1296 (3d Cir. 1996).

Pursuant to 42 U.S.C. § 2000e-5(e)(1), a claimant must first file a charge with the EEOC within 180 days from the date of the alleged unlawful employment practice. *See Burgh v. Borough Council of Montrose*, 251 F.3d 465, 469 (3d Cir. 2001). The 180-day filing deadline may be extended to 300 days if the charge is also covered by a state or local anti-discrimination law. *See Cardenas v. Massey*, 269 F.3d 251, 255 n.2 (3d Cir. 2001) (stating that "because New Jersey has an anti-discrimination law, a claim must be presented to the EEOC within 300 days of the alleged unlawful employment practice."); *see also Garcia v. Hanwha Solarone USA, Inc.,* 2013 U.S. Dist. LEXIS 84595, at *6 (D.N.J. June 17, 2013) (stating that "[t]he 180-day deadline is extended to 300 days when the complainant lives in a 'deferral state,' such as New Jersey."). If the complainant initiates a complaint with a parallel state or local agency, the period for filing a charge with the EEOC is similarly extended to 300 days from the date of the alleged unlawful employment practice, or within 30 days after receiving notice that the state or local agency has terminated its proceedings, whichever occurs first. *See* 42 U.S.C. § 2000e-5(e)(1).

The EEOC is then required to investigate the charge within 180 days and notify the complainant of its resolution. *See* 42 U.S.C. § 2000e-5(f)(1); *see also Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 361, 53 L. Ed. 2d 402, 97 S. Ct. 2447 (1977) (holding that a private right of action does not arise until 180 days after a charge has been filed). If, after 180 days, the EEOC finds no reason to take action on the charge, it must notify the complainant by issuing a "right-to-sue" letter. *Burgh*, 251 F.3d at 470 (citing *see* 42 U.S.C. § 2000e-5(f)(1)). "A complainant may not bring a Title VII suit without having first received a right-to-sue letter." *Burgh*, 251 F.3d at 470; *Anjelino v. New York Times Co.*, 200 F.3d 73, 87 (3d Cir. 1999); *Robinson v. Dalton*, 107 F.3d 1018, 1020 (3d Cir. 1997). Once a complainant receives a right-to-sue letter, he has 90 days to bring a private action. *See* 2000e-5(f)(1). The on-set of the 90-day period is generally considered to be the date on which the complainant receives the right-to-sue letter. *See Burgh*, 251 F.3d at 470.

Both the 180-day period for filing the administrative complaint (or the 300-day period if there is a parallel state filing) and the 90-day period for filing the court action operate as "statutes of limitations." *Id*. (citing *Zipes v. Trans World Airways, Inc.*, 455 U.S. 385, 393, 71 L. Ed. 2d 234, 102 S. Ct. 1127 (1982)). The Third Circuit has "strictly construed the 90-day period and held that, in the absence of some equitable basis for tolling, a civil suit filed even one day late is time-barred and may be dismissed. *Id*. (citing *Figueroa v. Buccaneer Hotel Inc.*, 188 F.3d 172, 176 (1999)). The statute of limitations period, however, "does not begin to run unless and until there is a 'final agency action,' such as the issuance of a right-to-sue letter." *Id.* (citation omitted). Without that final agency action, the complainant "has not exhausted his administrative remedies and cannot bring suit." *Id*. (citing *Anjelino*, 200 F.3d at 87). Moreover, a plaintiff who receives a right-to-sue letter and decides to file suit must affirmatively plead fulfillment of the administrative exhaustion requirement as well

as receipt of the right-to-sue letter within his complaint. *See Karipidis v. Ace Gaming LLC*, 2010

U.S. Dist. LEXIS 56617, at *15 (D.N.J. June 9, 2010).

In certain circumstances, the continuing violation doctrine creates an equitable exception to

the statute of limitations. "When a defendant's conduct is part of a continuing practice, an action is

timely so long as the last act evidencing the continuing practice falls within the limitations period; in

such an instance, the court will grant relief for the earlier related acts that would otherwise be time

barred." *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1295

(3d Cir. 1991). However, in *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S.

Ct. 2061, 153 L. Ed. 2d 106 (2002), the Supreme Court limited the applicability of the continuing

violation doctrine, holding that "discrete discriminatory acts are not actionable if time barred, even

when they are related to acts alleged in timely filed charges." That is because "[e]ach discrete

discriminatory act starts a new clock for filing charges alleging that act." *Id*. In *National R.R.*

*Passenger Corp.*, the Court held that the continuing violation doctrine is not applicable to "[d]iscrete

acts such as termination, failure to promote, denial of transfer or refusal to hire" because "[e]ach

[such] incident of discrimination . . . constitutes a separate actionable 'unlawful employment

practice.'" *Id.* at 114. The Third Circuit has stated that, in addition to those discrete acts listed in

*National R.R. Passenger Corp.*, other discrete acts that constitute a separate actionable claim

include: "wrongful suspension, wrongful discipline, denial of training, [and] wrongful accusation."

*O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006). As explained in *O'Connor*, "causes

of action that can be brought individually expire with the applicable limitations period." *Id.* at 128.

Here, there is no evidence indicating whether Plaintiff ever filed a charge with the EEOC

based on the alleged unlawful employment practices that now form the basis of his Complaint or

whether he received a right-to-sue letter from the EEOC prior to bringing this suit.[6] Plaintiff fails to affirmatively plead fulfillment of the administrative exhaustion requirement or receipt of a right-to-sue letter in his Complaint. Because "[a] complainant does not state a claim upon which relief may be granted unless [he] asserts the satisfaction of the precondition to suit specified by Title VII[, namely] prior submission of the claim to the EEOC for conciliation or resolution[,]" Plaintiff's Complaint is subject to dismissal on this basis alone. *See Karipidis*, 2010 U.S. Dist. LEXIS at *15 (citing *Robinson*, 107 F.3d at 1022).

Even assuming that Plaintiff filed a charge and received a right-to-sue letter from the EEOC with respect to the alleged unlawful employment practices that form the basis of his Complaint, it appears that Plaintiff failed to file suit within the prescribed limitations periods found in 42 U.S.C. § 2000e-5. The Complaint indicates that the discrete acts which form the basis of Plaintiff's Title VII claims occurred in 2006, 2007 and, most recently, in November of 2010.

For example, Defendant Frank Cirillo is alleged to have discriminated against Plaintiff by "ignoring oral and written complaints of harassment by Social Work [a]dministrators and supervisors[]" when conducting the February 16, 2007 and May 17, 2007 disciplinary hearings. (Compl. at 2). Plaintiff further contends that Cirillo retaliated against him in violation of Title VII by changing a June 13, 2007 vacation day to a suspension day after receiving Robert Forrester's July 2, 2007 memorandum requesting a "more punitive" suspension. (*Id.*). Assuming that Plaintiff filed a charge with the EEOC on the final day of the statutorily imposed 300-day deadline and the EEOC took the maximum 180-day period to investigate Plaintiff's charge, Plaintiff would have received a right-to-sue letter from the EEOC sometime in late 2008. Plaintiff's filing of his Complaint on January 13, 2011 clearly falls outside the 90-day period within which he was obligated to file suit.

---

[6] While the Plaintiff attached a right-to-sue letter addressed to him by the EEOC as an exhibit to his Complaint, that letter is dated April 30, 2002 and does authorize Plaintiff to bring this suit almost nine years later. (*See* Compl., Ex. A at 56).

Accordingly, the Court finds that Plaintiff's Title VII claims asserted against Defendant Cirillo are time-barred.

A similar analysis applies to the Plaintiff's Title VII claims asserted against Defendants Smith, Ruckman, Forrester, and Sababu. Defendant Delores Smith is alleged to have harassed Plaintiff by "refus[ing] to [acknowledge] complaints of harassment" he lodged against Administrator Ruckman and failing to ensure that Plaintiff was properly paid and given credit for having worked on May 31, 2007. (*Id*.). Defendant Susan Ruckman is alleged to have retaliated against Plaintiff by participating in the February 2007 and May 2007 disciplinary investigations which resulted in Plaintiff's three and five-day suspensions. (*Id*.).[7] Defendant Robert Forrester is alleged to have retaliated against Plaintiff by penning the July 2, 2007 memorandum to Director Cirillo requesting a "more punitive" suspension. (*Id*. at 3). Defendant Amini Sababu is alleged to have retaliated against Plaintiff by falsifying his time sheets in May 2007. (*Id*. at 3-4). In each instance, even if the Court assumed that Plaintiff filed a charge with the EEOC and received a right-to-sue letter within the prescribed limitations periods, Plaintiff's claims against these Defendants would still be time-barred because Plaintiff did not file a private action until January 13, 2011.[8]

With respect to the allegations against Defendants Cacace, Harcar and Wood, after viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff failed to exhaust his administrative remedies prior to filing suit. Defendant James Cacace is alleged to have retaliated

---

[7] In addition, in his Response to Defendants' Interrogatories, Plaintiff alleges that Ms. Ruckman "colluded and participated" with Ms. Wise in relation to her January 31, 2006 racially insensitive comment. (Pl.'s Resp. to Defs.' Interrogs. at ¶ 3).

[8] While the record indicates that Plaintiff filed an administrative complaint with the DCR on March 8, 2007 based upon the three-day suspension he received on February 22, 2007, Plaintiff's DCR filing did not relieve him of his obligation to file a charge with the EEOC before asserting his related Title VII claim. Rather, Plaintiff was obligated to file a charge with the EEOC within 300 days of receiving the three-day suspension or within 30 days of having received notice from the DCR that it had concluded its proceedings, whichever came earlier. *See* 42 U.S.C. § 2000e-5(e)(1). Since the final adjudication of Plaintiff's March 8, 2007 complaint did not occur until December 2011, the former deadline would apply. As previously discussed, even if Plaintiff had filed a charge with the EEOC within the 300-day deadline, his current Title VII claims based on the three-day suspension would still be time-barred because he did not file suit until January 13, 2011.

against Plaintiff by "accus[ing] Plaintiff . . . of illegally accessing his supervisor's computer" on August 11, 2010. (*Id*. at 4). Defendant Christina Harcar is alleged to have harassed Plaintiff by failing to follow proper agency procedures in addressing the August 11, 2010 incident. (*Id*. at 3). Defendant John Wood is alleged to have retaliated against Plaintiff by asking him a question "in an aggressive manner" during a mandatory meeting on November 10, 2010. (*Id*. at 4). With respect to the August 11, 2010 incident, even if Plaintiff had filed a charge with the EEOC that same day, a private right of action would not have arisen until February 7, 2011, 180 days after the charge had been filed. *See Occidental Life Ins. Co.*, 432 U.S. at 361. Similarly, with respect to the November 10, 2010 incident, a private right of action would not have arisen until May 9, 2011. *See id*. Even assuming that Plaintiff had in fact filed a charge with the EEOC based on these allegations, he failed to exhaust his administrative remedies by filing his Complaint months before the EEOC could have completed its investigation and issued a right-to-sue letter. Accordingly, to the extent that Plaintiff's Title VII claims are based on the alleged discriminatory and retaliatory actions of Defendants Cacace, Harcar and Wood, the entry of summary judgment in favor of Defendants is appropriate.

Even if this Court were to deem Plaintiff's claims to have been timely filed, after reviewing the evidence in the light most favorable to Plaintiff, the Court finds that those claims still cannot survive Defendants' Motion for Summary Judgment for the reasons discussed below.

## 2. Title VII Claims Against Individual Defendants

Plaintiff's Complaint asserts that each of the individually named Defendants engaged in discriminatory and/or retaliatory actions against him in violation of Title VII. Third Circuit jurisprudence, however, is clear that Title VII does not subject individual supervisory employees to liability. *See Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1078 (3d Cir. 1996) ("Congress did not intend to hold individual employees liable under Title VII."); *see also Newsome*

*v. Admin. Office of the Court of the State of N.J.*, 51 Fed. Appx. 76, 79 n.1 (3d Cir. 2002) ("it is

settled that Title VII does not provide for individual liability"); *Emerson v. Thiel Coll.*, 296 F.3d

184, 190 (3d Cir. 2002) ("individual employees are not liable under Title VII"). Here, the record

clearly indicates that each of the individually named Defendants is a current or former supervisor or

employee of the MCBSS. Accordingly, to the extent that Plaintiff's Title VII claims are asserted

against Defendants Cirillo, Smith, Ruckman, Forrester, Harcar, Sababu, Cacace and Wood, the entry

of summary judgment in favor of those Defendants is appropriate. The Court must now determine

whether Defendant MCBSS is similarly entitled to summary judgment on Plaintiff's Title VII

claims.

### 3.  Plaintiff's Title VII Discrimination Claim

Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on "race,

color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a); *Burlington N. & Santa Fe Ry. Co. v.*

*White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). In assessing claims under Title VII

and related retaliation claims, courts apply the burden-shifting analysis set forth in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802-03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Under that

analysis, a plaintiff must satisfy the initial burden of making a *prima facie* case of discrimination.

To establish a *prima facie* case of discrimination under Title VII, a plaintiff must show the

following: (1) that he is a member of a protected class; (2) that he was qualified for the position; (3)

that he suffered an adverse employment action; and (4) that the adverse action occurred under

circumstances that give rise to an inference of discrimination. *Jones v. Sch. Dist. of Philadelphia*,

198 F.3d 403, 412 (3d Cir. 1999). An adverse employment action is a material change in the terms

and conditions of employment. *See Burlington N.*, 548 U.S. at 60.

If the employee makes out a *prima facie* case, the burden of production shifts to the employer to establish a legitimate, nondiscriminatory reason for its actions. *Fuentes v. Borough of Watchung*, 286 F. Appx. 781, 784-85 (3d Cir. 2008). If the employer establishes a legitimate, nondiscriminatory reason for its actions, the burden of production shifts back to the employee to show that the employer's proffered reason was a pretext for actual discrimination. *Id.* The Third Circuit has held that a plaintiff may defeat a motion for summary judgment by pointing "to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.*

Here, after viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has failed to establish a *prima facie* case of discrimination. Plaintiff seems to be able to establish the first three elements of his *prima facie* case: (1) Plaintiff is an African American and thus a member of a protected class; (2) Plaintiff was qualified to serve as a social worker as evidenced by his 24-plus years of service at the MCBSS ; and (3) Plaintiff suffered an adverse employment action when he was suspended on two separate occasions in February and May of 2007. The circumstances of this case, however, do not give rise to an inference of discrimination by the MCBSS or any of its employees. Aside from the racially insensitive comment made by an employee of the separate non-profit entity Home Front, Inc. in 2006, there is no indication that Plaintiff experienced any discrimination during his 24-year employment with the MCBSS. Even if that discrete comment provided the inference of discrimination necessary to establish a *prima facie* case, Defendants still had multiple legitimate, non-discriminatory reasons to justify adverse employment action against Plaintiff. The record indicates that Plaintiff acted in a manner unbecoming a public employee and violated the Mercer County Employee Integrity Policy and Professional Conduct

19

Policy by exhibiting a confrontational demeanor towards a vendor of the MCBSS and paying the mortgage arrears and utility bills of a MCBSS client. Defendants' decision to suspend Plaintiff for three days in February 2007 was further supported by the ALJ's November 15, 2011 decision dismissing Plaintiff's DCR complaint. Plaintiff offers no evidence "from which a factfinder would reasonably disbelieve the employer's articulated legitimate reasons" or "believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 286 F.3d at 784. Accordingly, to the extent that Plaintiff's Title VII claims are based on discrimination due to race or sex, the entry of summary judgment in favor of Defendants is appropriate.

### 4. Plaintiff's Title VII Hostile Work Environment Claim

The scope of protection provided by Title VII includes protection against a hostile work environment that is abusive to an employee on the basis of his or her race. *Cardenas*, 269 F.3d at 260; *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 753 (3d Cir.1995). In order to establish a hostile work environment claim under Title VII, a plaintiff must show the following: "(1) he suffered intentional discrimination because of his [race]; (2) the discrimination was pervasive and regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability." *Cardenas*, 269 F.3d at 260 (citing *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir.1996)).

The Third Circuit has held that "offhanded comments, and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim." *Caver v. City of Trenton,* 420 F.3d 243, 262 (3d Cir.2005) (internal quotations and citation omitted). Instead, the "conduct must be extreme to amount to a change in the terms and conditions of employment." *Id.* In assessing hostile work environment claims, the court does not review individual incidents in

isolation; instead, it must look at the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it involves physical threats or humiliation, and whether it interferes with the employee's work performance. *Id.* at 262-63.

Here, when the conduct complained of by Plaintiff is viewed under the totality of the circumstances, Plaintiff fails to show he suffered pervasive, intentional discrimination because of his race or sex. The Court agrees with Defendants that the discrete events giving rise to Plaintiff's hostile work environment claim more closely resemble "workplace disputes[] [and] disagreements that are to be expected in the course of employment[.]" (Defs.' Br. at 1). The only incident of possible discrimination in the record is the comment made by Ms. Wise in January of 2006. When viewed in the context of 24 years of employment, and in consideration of the fact that Ms. Wise was not even an employee of the MCBSS, this complaint does not appear to rise to the type of extreme harassment that would change the terms and conditions of Plaintiff's employment. For this reason, the Court grants summary judgment in favor of the Defendants on Plaintiff's hostile work environment claim.

### 5. Plaintiff's Title VII Retaliation Claim

Title VII also prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII] . . . , or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII.]" 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation under Title VII, a plaintiff must establish the following: "(1) [he] engaged in activity protected by Title VII**;** (2) the employer took an adverse employment action against [him]; and (3) there was a causal connection between [his] participation in the protected activity and the adverse employment action." *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir.1995).

If the employee establishes this *prima facie* case of retaliation, the *McDonnell Douglas* burden shifting analysis applies: "the burden shifts to the employer to advance a legitimate, non-retaliatory reason" for its conduct and, if it does so, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Krouse v. Am. Sterilizer Co.,* 126 F.3d 494, 500-01 (3d Cir.1997).

Here, there is no evidence in the record to support the claim that Defendants' actions against Plaintiff were in retaliation for filing a complaint with the DCR, disputing his time sheets, or opposing discrimination made illegal by Title VII. Plaintiff produces no evidence which could in any way be construed as showing that Defendants' decisions regarding Plaintiff's employment were motivated by any reason other than Plaintiff's violations of his terms of employment. For these reasons, the Court will also enter summary judgment in favor of Defendants on Plaintiff's retaliation claim.

III.    **CONCLUSION**

For the reasons set forth above, Defendants' Motion for Summary Judgment is granted. An appropriate Order follows.


Date: May 20, 2014                              *s/Peter G. Sheridan*
                                                PETER G. SHERIDAN, U.S.D.J.